UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF ABATEMENT
WORKERS REGIONAL LOCAL
UNION NO. 207 HEALTH AND WELFARE
FUND;TRUSTEES OF ABATEMENT
WORKERS REGIONAL LOCAL UNION
NO. 207 DEFINED CONTRIBUTION
PENSION FUND; et al.,

               Plaintiffs,

                                                 CASE NO. 11-CV-13982

vs.

                                                 HON. GEORGE CARAM STEEH

NORTHWEST FIRESTOP, INC., and
JAMES K. HOUSE,

               Defendants.

_____/

ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Doc. 21)

     This ERISA action, 29 U.S.C. § 1001, et. seq, seeks alleged unpaid employee

wage and fringe benefit contributions for the period from June, 2008 to December,

2010.  Plaintiffs are the Trustees of various employee benefit funds ("Funds") for the

Abatement Workers Regional Local Union No. 207 ("Union").  Defendants are the

employer, Northwest Firestop ("Northwest") and its owner/operator James House.

Based on their audit, plaintiffs claim that $269,346.23 is owing comprised of

$244,860.21 for delinquent fringe benefit contributions, and $24,486.02 in liquidated

damages.  Plaintiffs now move for summary judgment as to this amount.  Plaintiffs also

claim that they are entitled to additional interest that accumulates during this

proceeding, court costs, attorney fees, and liquidated damages.  Defendants respond

-1-

that contributions are not owing for times when workers received training, House is not personally liable for alleged breach of fiduciary duty, plaintiffs' audit contains numerous inaccuracies, and the amount sought for liquidated damages is barred by plaintiffs' alleged claim for a lesser amount in its earlier withdrawn motion for summary judgment. A hearing was held on May 9, 2013.  For the reasons stated below, plaintiffs' motion shall be denied as to all claims except to the extent that House admits he was a fiduciary after July, 2009.

<u>FACTUAL BACKGROUND</u>

Northwest is in the business of fire stopping, which involves containing fires in one area from the next by sealing all points of entry, usually constructed in places like hospitals, respite care facilities, and schools.  James House is the sole owner of Northwest and has been for eleven years.  (Doc. 22, Ex. 1 at ¶ 3).  On June 2, 2008, the Union and Northwest entered into a collective bargaining agreement ("CBA") whereby Northwest agreed to make employee fringe benefit contributions for each employee covered by the CBA.  (Doc. 21, Ex. 2 at 3, Article III, ¶ 1).  House states that he entered into the CBA with the Union in order to gain access to a labor pool for various fire stopping projects.  (Doc. 22, Ex. 1 at ¶ 6).  Because defendants stopped making fringe benefit contributions, Keith Messing performed an audit on Plaintiffs' behalf for the time period June, 2008 through December, 2010.  (Doc. 21, Ex. 3).  In his affidavit, he avers that he determined contributions allegedly owing to the Funds by comparing figures from the employee time card reports provided by the employer against hours paid to the Funds.  <u>Id.</u>  His audit alleges that $269,346.23 is outstanding from June, 2008 through December, 2010, consisting of $244,860.21 for delinquent fringe benefit contributions

-2-

and $24,486.02 for liquidated damages and interest for late payments.  (Doc. 21, Ex. 3 at ¶ 4).

The parties agree that the relevant language of the CBA governing Northwest's responsibility to make contributions provides that, "[t]he Employer agrees to pay the wages and fringe benefit contributions as set forth in Addendum A, for each hour worked by every covered Employee, whether same is considered as probationary, non-union, temporary, seasonal or casual."  (Doc. 21, Ex. 2 at 3, Article III ¶ 1).  Plaintiffs contend that this broad language necessarily covers those employees receiving training while defendants contend that it does not.

House has submitted an affidavit stating that Northwest operates in a unique niche requiring specially trained employees.  (Doc. 22, Ex. 1 at ¶ 7-8).  House further states that the parties agreed that the Union would train its employees in firestopping and the CBA so provides.  (Doc. 21, Ex. 2 at 2, Article II, ¶ 3).  Defendants claim that the parties allegedly agreed that the CBA would not cover the training for a period of 60 days.  (Doc. 22, Ex. 1 at ¶ 10).  House further avers that since the training was not complete within the 60-day period envisioned by the parties, the CBA did not govern employees for the greater part of 2008.  Id. at ¶ 15.  House submitted an affidavit stating that there was a course of dealing or mutual understanding that employees in training were not covered under the CBA.  (Doc. 22, Ex. 1 at ¶ 13-15).  Plaintiffs argue that this court may not consider defendants' contention that the parties had some oral understanding that employees in training were not covered because the plain terms of the CBA control and most personal contract defenses may not be considered under ERISA.

-3-

Northwest's office administrator, Sarah Marlow, performed her own audit.  (Doc. 22, Ex. 2).  She alleges that based on her review of employment records, Messing erred in preparing his audit because he used the wrong number of hours worked for certain employees, inflated hours allegedly unreported by Northwest, used incorrect figures from payroll records, and included individuals who were not members of the Union. While defendants' audit revealed a discrepancy of about $68,964.66 in unpaid contributions, they contend this amount reflects time worked by employees in training. Plaintiffs, in return, direct the court's attention to numerous payroll records provided by Northwest which Messing used in preparing his audit.  (Doc. 24, Ex. 1-5).  Plaintiffs also contend that House acted as an ERISA fiduciary based on his status as sole owner/operator of Northwest, and thus, is personally liable for all unpaid contributions. House responds that he was not responsible for day-to-day operations of fringe benefit contributions prior to July, 2009.  (Doc. 22, Ex. 1 at ¶ 23)

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

-4-

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  Anderson, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

-5-

ANALYSIS

1.      Whether Employees in Training Were Covered Employees

Plaintiff Funds seek to recover unpaid contributions pursuant to § 515 of ERISA,

29 U.S.C. § 1145.  Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer
> plan under the terms of the plan or under the terms of a collectively
> bargained agreement shall, to the extent not inconsistent with law, make
> such contributions in accordance with the terms and conditions of such
> plan or agreement.

29 U.S.C. § 1145.  The central issue in the parties' dispute is whether employees in

training were covered employees under the CBA.  In interpreting collective bargaining

agreements, the Sixth Circuit has explained that the court must "consider the language

of the agreement, the context in which that language appears and other traditional

canons of construction."  Prater v. Ohio Ed. Ass'n, 505 F.3d 437, 441 (6th Cir. 2007).

Under ERISA, the Sixth Circuit has held that "multiemployer plans are entitled to rely on

the literal terms of written commitments between the plan, the employer, and the union,"

and that "the actual intent and understandings between the contracting parties are

immaterial."  Bakery & Confect. Union & Indus. Int'l Health Ben. & Pension Funds v.

New Bakery Co., 133 F.3d 955, 959 (6th Cir. 1998). The Sixth Circuit has further

explained that a fund "thus stands much like a holder in due course in commercial law

who is entitled to enforce the writing 'without regard to understanding or defenses

applicable to the original parties.'"  Id. (quoting Central Penn. Teamsters Pension Fund

v. McCormick Dray Line, 85 F.3d 1098, 1103 (3rd Cir. 1996)).  In general, certain

traditional contractual defenses, such as fraud in the inducement, are not available in a

suit brought to recover delinquent contributions under ERISA.  Southwest Admin., Inc.

-6-

v. Rozay's Transfer, 791 F.2d 769, 773) (9th Cir. 1986), cert. denied, 479 U.S. 1065

(1987).

 Defendants argue that principles of contract law should guide this court's

interpretation of a collective bargaining agreement under ERISA citing Tackett v. M & G

Polymers, USA, LLC, 561 F.3d 478, 489 (6th Cir. 2009). Where the collective

bargaining agreement is ambiguous, defendants contend that just as in an ordinary

contract dispute, ambiguous language may be resolved by extrinsic evidence. Id. In

Tackett, the Sixth Circuit summarized the principles of interpreting a collective

bargaining agreement:

> In interpreting a CBA, court must (1) "look at the explicit language," (2) evaluate
> that language "in light of the context" that led to its use, (3) "interpret each
> provision. .. . as part of the integrated whole," (4) construe each provision
> "consistently with the entire document and the relative positions and purposes of
> the parties," (5) construe the terms "so as to render none nugatory" and to "avoid
> illusory promises," (6) look to other words and phrases in the document to
> resolves ambiguities, and (7) "review the interpretation . . . for consistency with
> federal labor policy."

Id. at 489 n. 7 (quoting UAW v. Yard-Man, 716 F.3d 1476, 1479-80 (6th Cir. 1983)).

This court is well aware of the Sixth Circuit's admonition that where plan language is

clear, the plan "may not be modified or superseded by oral undertakings on the part of

the employer," Central States, S.E. & S.W. Areas Pension Fund v. Behnke, Inc., 883

F.2d 454, 460 (6th Cir. 1989) (citations omitted), but this case presents the situation

where the plan language is, in fact, ambiguous.

 Plaintiffs contend that this court may not consider defendants' claim the parties

had a course of dealing whereby it was understood that employees in training were not

covered under the CBA, because traditional contract defenses are not available in an

ERISA action brought to collect delinquent contributions.  In support of this argument, the Funds rely on Iron Workers' Local 25 Pension Fund v. Allied Fence & Security Systems, 922 F. Supp. 1250, 1252-53 (E.D. Mich. 1996), where Judge Rosen addressed whether certain traditional contract defenses were available in an ERISA action for delinquent fringe benefits where the employer alleged that he was unaware that he was signing a collective bargaining agreement because of fraud by the union that he was only signing a temporary permit.  Judge Rosen ruled that fraud in the inducement was not a viable ERISA defense, and that where the employer failed to show fraud in the execution, because he had time to review the collective bargaining agreement prior to signing it, the employer was bound by the collective bargaining agreement.  Id. at 1260.  In reaching this conclusion, Judge Rosen noted that although the result was somewhat stark, it was consistent with Congressional policy that ERISA plans not be subject to the high litigation costs in seeking to collect delinquent contributions where employers relied on alleged various contract formation defenses. Id. at 1260.

Based on this rationale, plaintiffs here argue that defendants cannot avoid liability for unpaid benefit contributions under ERISA on the theory that they had an oral understanding that the CBA was not in effect, because the personal contract defense of "fraud in the inducement," is unavailable.  Defendants, however, do not seek to rely on a fraud in the inducement or other traditional contract formation defense, and thus Allied Fence & Security Systems is not applicable here.  Rather, defendants argue that the language of the CBA itself is ambiguous, thus, allowing this court to consider extrinsic evidence.  A plain reading of the CBA, and the one urged by defendants, reveals that an

-8-

ambiguity exists as to whether workers receiving training are, in fact, covered

employees. Article III, ¶ 1 of the CBA provides that "[t]he Employer agrees to pay the

wages and fringe benefit contributions as set forth in Addendum A, for each hour

worked by every covered Employee, whether same is considered as probationary, non-

union, temporary, seasonal or casual." (Doc. 21, Ex. 2 at 3). The absence of the word

"training" in the above quoted provision creates an ambiguity as to whether workers still

receiving training were covered employees. Where other provisions of the CBA

specifically mention "training," but the provision describing when contributions must be

paid (Article III, ¶ 1) does not, an ambiguity exists.

Specifically, defendants point to a provision in the CBA that requires the Union

and the Union's Training Fund to provide the firestop training, (Doc. 21, Ex. 2 at 2,

Article II, ¶ 3) and to another provision that provides "[t]raining contributions shall be

paid for all hours worked to the . . . Fund." (Doc. 21, Ex. 2 at 3, Article III, ¶1(C)).

Perhaps most persuasively, defendants direct the court's attention to Article III, ¶

1(F)(c), which provides:

> Contributions shall be paid on behalf of any employee starting with the
> employee's first day of employment in a job classification covered by this
> Agreement. This includes, but is not limited to: insulation workers, firestop
> and hazardous waste workers in the following classifications: journeyman,
> helpers, *trainees*, and probationary employees.

(Doc. 21, Ex. 2 at 4) (emphasis added). The provision quoted above is set apart from

the general provision calling for wage and fringe benefit contributions and applies only

to "Heat & Frost Insulators & Allied Workers Labor-Management Cooperative Trust."

Because several other provisions of the CBA specifically address employees in

"training" while Article III, ¶ 1 does not, this court finds that the absence of such language in the general provision calling for contributions is significant.

Defendants also argue that proof of the parties' oral agreement that training time was not covered lies in the fact that Northwest asked the Union to extend the training program from the initial time period of 60 days.  (Doc. 22, Ex. 1 at ¶ 11-13).  The Funds respond that this court cannot consider alleged oral agreements that the CBA would not be in effect until certain prerequisites were met because no personal contract formation defenses are available in a suit to collect delinquent benefits.  Rozay's Transfer, 791 F.2d at 773.  At issue here, however, is not a contract formation issue but a question as to an interpretation of the four corners of the CBA itself.  Michigan law is clear that contracts must be construed as a whole, to give meaning to every word and phrase. Workmon v. Publishers Clearing House, 118 F.3d 457, 459 (6th Cir. 1997) (citations omitted).

Defendants further persuasively point out that because the CBA uses the word "probationary" to describe covered employees in Article III, ¶ 1, but does not expressly use the word "training" within that same paragraph, means trainees may be excluded. Defendants have not, however, moved for summary judgment and the court does not reach a conclusive decision as to whether employees in training are covered or not. The court finds only that an ambiguity exists and is prepared to consider extrinsic evidence at the bench trial of this matter.  In sum, the omission of the term "training" in Article III, ¶ 1 creates an ambiguity; thus, plaintiff's motion for summary judgment as to that issue must be denied.

-10-

2.     Whether House is an ERISA Fiduciary Subject to Personal Liability

An ERISA fiduciary who breaches his fiduciary duty "shall be personally liable to make good to such plan any losses to the plan resulting from each breach."  29 U.S.C. § 1109(a).  Whether someone is an ERISA fiduciary is a legal conclusion to be determined by the trier of fact.  Ackers v. Palmers, 71 F.3d 226, 230 (6th Cir. 1995).  A person is considered to be a fiduciary with respect to a plan if "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A).  This court and many other judges in this district have held that pension and benefit fund contributions are plan assets as soon as they are due and owing.  E.g. Trustees of Roofers Local 149 v. J.D. Candler Roofing Co., No. 12-CV-10048, 2013 WL 154216, at *4 (E.D. Mich. Jan. 15, 2013);  Trustees of the Detroit Carpenters Fringe Benefit Funds v. Nordstrom, __ F. Supp. 2d __, No. 10-CV-14160, 2012 WL 5352982, *4 (E.D. Mich. Sept. 27, 2012) (Rosen, J.) (collecting cases). Individuals who have discretionary control over the company's finances while contributions are due are fiduciaries regarding plan assets.  See Iron Workers' Local No. 25 Pension Fund v. McGuire Steel Erection, Inc., 352 F. Supp. 2d 794, 804 (E.D. Mich. 2004) (Zatkoff, J.) (citing Michigan Affil'd Health-Care Sys., Inc. v. CC Sys. Corp., 139 F.3d 546, 549 (6th Cir. 1998)); Nordstrom, 2012 WL 53552982, at *6.  In Nordstrom, Judge Rosen held that the sole owner and officer of a construction company was personally liable for unpaid contributions to the ERISA plans where he made all the day-to-day decisions regarding which creditors were paid and when, was the sole

-11-

signatory on the company's only bank account, and elected to pay general creditors
instead of making required contributions to the funds.  2012 WL 5352982, at *5.

Similarly, in this case, it is not disputed that House was the sole corporate owner
and officer of Northwest.  According to his affidavit, he assumed responsibility for day-
to-day operations of fringe benefit contributions after July, 2009.  (Doc. 22, Ex. 1 at ¶
23).  Thus, there is no genuine issue of material fact that should any delinquent benefits
be found to be owing, House is a fiduciary subject to personal liability after July, 2009.
The real question for the court is whether House can be held personally liable from
June, 2008 until July, 2009.  Based on the record now before this court, a factual issue
remains as to whether he can be so held.  In reaching this conclusion, the court is
mindful that House has not yet been deposed.  As to the time period prior to July, 2009,
the only evidence before the court is that House was the sole owner of Northwest and
that he wrote some checks.  Further factual development is needed to determine if he
did, in fact, exercise discretionary control over plan assets.

This court recently noted in J.D. Candler Roofing, "some courts take a closer look
at the particular case in order to determine if the individual at the company knew he was
a fiduciary under the trust documents as incorporated by the CBA" before personal
liability arises.  2013 WL 154216, at *4 (citing Iron Workers Local No. 25 Pension Fund
v. Future Fence Co., No. 04-73114, 2006 WL 2927670 (E.D. Mich. Oct. 12, 2006)
(Duggan, J.) and Sheet Metal Local 98 Pension Fund v. AirTab Inc., No. 09-3121, 2012
WL 1940229 (6th Cir. May 29, 2012)).  In AirTab, the Sixth Circuit ruled that an
owner/officer and "coordinator" of the defendant corporation could not be held
personally liable for breach of fiduciary duty because mere nonpayment of a

contribution did not amount to control over plan assets.  2012 WL 1940229, at *2.  The mere fact that unpaid contributions are considered "plan assets" when they become due and owing does not translate into a finding that corporate officers are plan fiduciaries. Future Fence, 2006 WL 2927670, at *3.  In Future Fence, Judge Duggan explained that such a holding "would convert every contributing employer into a plan fiduciary."  Id. Based on the Sixth Circuit's recent holding in Air Tab, House's mere status as owner of Northwest is not be a sufficient basis on which to hold him personally liable.  Further factual development is needed to determine whether he exercised the necessary authority or control of the management of plan assets such that he may be held personally liable for unpaid contributions for the time period from June, 2008 until July, 2009.

3.      Alleged Inaccuracies in Messing's Audit

        A.      Purported Supervisors

        Defendants argue that plaintiffs' audit inflates the amount allegedly owing by about $50,000 because it included workers Terry Smith and Richard Liggett as covered employees when they were allegedly supervisors.  The CBA clearly provides that supervisors are not covered employees but foreman are.  (Doc. 21, Ex. 2 at 1, Article I, ¶ 1-2).  The CBA further provides that foreman are to be paid an additional $1.50 an hour over their regular wages.  (Ex. 21, Ex. 2 at 8, Article VI, ¶ 2).  In support of their claim that Smith and Liggett are uncovered supervisory employees, defendants rely on the affidavit of House to this effect.  (Doc. 22. Ex. 1 at ¶ 21).  Plaintiffs reply with a copy of Smith's union membership identification card, and authorization forms dated July 8, 2008, allowing the Union to deduct dues from his pay and to represent him in collective

bargaining. (Doc. 24, Ex. 6). At oral argument, however, defense counsel represented that Smith's union membership ended during the relevant time period when he was allegedly promoted. Plaintiffs also respond with evidence that Northwest recorded the wage and hour records of both Smith and Liggett on the same labor reports as covered employees. A review of these pay records shows that Smith earned approximately $25 per hour for the relevant time period and Liggett earned approximately $20 per hour. (Doc. 24, Ex. 1). Other covered employees earned approximately $12 to $20 per hour. (Doc. 24, Ex. 1).

In support of their claim that Smith and Liggett are covered employees, plaintiffs rely on Judge Lawson's opinion in Laborers Pension Trust Fund v. Interior Ext. Spec. Co., No. 04-74514, 2008 WL 4443066, at *4 (E.D. Mich. Sept. 30, 2008), aff'd, No. 08-2526, 2010 WL 3521920 (6th Cir. Sept. 8, 2010) where he ruled that an employee was a covered worker despite the employer's claim he was a supervisor where the employee testified that he was a foreman, received a foreman's wages, and his employer made contributions on his behalf.[1] This case presents a closer question as neither Smith nor Liggett have been deposed nor have they submitted affidavits attesting to their alleged status as foremen. Because further factual development is needed for this court to decide whether Smith and/or Liggett were covered employees, plaintiffs' motion for summary judgment shall be denied as to their status.

---

[1]Plaintiffs rely on Michigan Laborers' Health Care Fund. v. Grimaldi Concrete, Inc., 30 F.3d 692, 697 (6th Cir. 1994), for the proposition that defendants bear the sole burden of documenting that Smith and Liggett were supervisors. That case is inapposite as it involved burden-shifting where the employer failed to keep any ERISA records.

-14-

   B.     Alleged Factual Inaccuracies in Messing's Audit

   In their response to the Funds' motion for summary judgment, defendants also

raise several technical objections to Messing's audit complaining that he considered

workers who had left Northwest prior to enactment of the CBA and that there were other

time record inaccuracies in his audit.  Based on a careful review of House's affidavit,

employer time records, and labor records submitted by the parties, this court finds that

genuine issues of material fact remain as to these issues.  Accordingly, the Funds are

not entitled to summary judgment based on Messing's audit.

   C.     Liquidated Damages, Interest, Costs and Attorney Fees

   Plaintiffs also seek liquidated damages, interest that accumulates during this

proceeding, costs and attorney fees.  ERISA clearly provides for the mandatory award

of such fees where a fiduciary has sued successfully to enforce an employer's

obligation to make contributions to a multi-employer plan.  29 U.S.C. § 1132(g)(2).

Defendants object to an award of liquidated damages in excess of $14,860 as

inequitable on the grounds that plaintiffs allegedly sought a lesser amount in an earlier

withdrawn motion for summary judgment.  Because the court has not found that

delinquent fringe benefit contributions are owing to plaintiffs under 29 U.S.C. § 1145,

the court makes no ruling as to whether the Funds are entitled to interest, costs, and

attorney fees, and does not consider defendants' argument as to the fairness of the

amount sought in liquidated damages, which is premature.

<div align="center">CONCLUSION</div>

   For the reasons stated above, plaintiffs' motion for summary judgment (Doc. 21)

is DENIED such that fact issues remain as to (1) whether contributions owing for

employees in training are required, (2) whether House is liable for breach of fiduciary

duty for the period from June, 2008 until July, 2009, (3) whether Terry Smith and

Richard Liggett are covered employees, (4) whether Messing's audit contains

inaccuracies, and (5) whether interest, costs, attorney fees, and liquidated damages

shall be awarded to plaintiffs; and GRANTED IN PART in that should unpaid

contributions found to be owing, James House is liable for breach of fiduciary duty for

the period after July, 2009.

Dated:  May 14, 2013

<div style="margin-left: 40%;">

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE
</div>

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 14, 2013, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---